**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | |
|---|---|
| CHRISTOPHER AND SUSAN SHELDON, <br><br> And <br><br> ROBERT E. SHELDON AND SANDRA J. FLESHER SHELDON, individually and as Trustees of THE SHELDON FAMILY REVOCABLE TRUST, <br><br> Plaintiffs, <br><br> -vs- <br><br> NICHOLS TRANSPORT COMPANY, INC., and DAVID HOWARD BENNETT, <br><br> Defendants. | Case No.:  7:19-cv-398 <br><br> Hon.  Thomas T. Cullen <br><br> Removed from Roanoke City Circuit Court (Case No.: CL 16-1171) |

<u>**NOTICE OF HEARING**</u>

PLEASE TAKE NOTICE that Defendant Nichols Transport Company, Inc.'s Motion To Exclude The Testimony And Reports Of Dr. David Scheiderer will be brought on for hearing at a date and time to be set by the judge.

Respectfully submitted,

LAW OFFICE OF COOLEY AND ASSOCIATES, PLC

Dated:  August 16, 2021

By:____/s/John L. Cooley_____
   John L. Cooley (VSB #25962)
Law Office Cooley and Associates PLC
40 British Woods Drive, Suite 101
P.O. Box 19687
Roanoke, VA  24019
Telephone:  (540) 339-3300
Facsimile:   (540) 323-1745
Email: jlcooley@cooleyfirm.com
*Co-Counsel for Defendant Nichols Transport Inc*

FOLEY, BARON, METZGER & JUIP, PLLC

By:    /s/Richard S. Baron
    Richard S. Baron (P33798 - MI)
    Nicholas J. Tatro (P79146 - MI)
Foley, Baron, Metzger & Juip, PLLC
38777 Six Mile Road, Suite 300
Livonia, MI  48152
Telephone: (734) 742-1855
Facsimile: (734) 521-2379
Email: rbaron@fbmjlaw.com; ntatro@fbmjlaw.com
Admitted *pro hac vice*

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| CHRISTOPHER AND SUSAN SHELDON, | Case No.:  7:19-cv-398 |
| And | Hon.  Thomas T. Cullen |
| ROBERT E. SHELDON AND SANDRA J. FLESHER SHELDON, individually and as Trustees of THE SHELDON FAMILY REVOCABLE TRUST, | Removed from Roanoke City Circuit Court (Case No.: CL 16-1171) |
| Plaintiffs, | |
| -vs- | |
| NICHOLS TRANSPORT COMPANY, INC., and DAVID HOWARD BENNETT, | |
| Defendants. | |

**DEFENDANT NICHOLS TRANSPORT COMPANY, INC.'S
MOTION TO EXCLUDE THE TESTIMONY AND REPORTS OF DR. DAVID SCHEIDERER**

Defendant Nichols Transport Company, Inc. ("Nichols"), by counsel, hereby respectfully moves this Court pursuant to Federal Rules of Evidence 403 and 702, and the controlling case law of *Daubert v Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589-890, 113 S.Ct. 2786 (1993), to exclude the reports and testimony of Dr. David Scheiderer from the trial of this matter.  Nichols respectfully asserts that the opinions, reports and testimony of Dr. Scheiderer fail to meet the exacting standards of FRE § 403 and 703 as well as *Daubert* and thus should be excluded.

In further support of this motion, Defendant relies upon the facts and law in the accompanying Memorandum of Law.

WHEREFORE, Defendant Nichols Transport Company, Inc. requests this Court grant its Motion to Exclude Dr. David Scheiderer's reports and testimony in this matter and enter an Order reflecting same.

Respectfully submitted,

LAW OFFICE OF COOLEY AND ASSOCIATES, PLC

Dated:  August 16, 2021

By:_____/s/John L. Cooley_____
    John L. Cooley (VSB #25962)
Law Office Cooley and Associates PLC
40 British Woods Drive, Suite 101
P.O. Box 19687
Roanoke, VA  24019
Telephone:  (540) 339-3300
Facsimile:  (540) 323-1745
Email: jlcooley@cooleyfirm.com
*Co-Counsel for Defendant Nichols Transport Inc*

FOLEY, BARON, METZGER & JUIP, PLLC

By:_____/s/Richard S. Baron_____
    Richard S. Baron (P33798 - MI)
    Nicholas J. Tatro (P79146 - MI)
Foley, Baron, Metzger & Juip, PLLC
38777 Six Mile Road, Suite 300
Livonia, MI  48152
Telephone: (734) 742-1855
Facsimile: (734) 521-2379
Email: rbaron@fbmjlaw.com; ntatro@fbmjlaw.com
Admitted *pro hac vice*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | |
|---|---|
| CHRISTOPHER AND SUSAN SHELDON, | Case No.: 7:19-cv-398 |
| And | |
| | Hon.  Thomas T. Cullen |
| ROBERT E. SHELDON AND SANDRA J. FLESHER SHELDON, individually and as Trustees of THE SHELDON FAMILY REVOCABLE TRUST, | Removed from Roanoke City Circuit Court (Case No.: CL 16-1171) |
| Plaintiffs, | |
| -vs- | |
| NICHOLS TRANSPORT COMPANY, INC., and DAVID HOWARD BENNETT, | |
| Defendants. | |

**DEFENDANT NICHOLS TRANSPORT COMPANY, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE**
<u>**THE TESTIMONY AND REPORTS OF DR. DAVID SCHEIDERER**</u>

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES ..................................................................................ii-iii

CONCISE STATEMENT OF ISSUES ...................................................................... iv

MOST APPROPRIATE CONTROLLING AUTHORITY ............................................... v

I.      INTRODUCTION ........................................................................................1

II.     STATEMENT OF UNDISPUTED FACTS ........................................................1

III.    APPLICABLE LAW .....................................................................................3

IV.     ANALYSIS        ..........................................................................................8

         a.      Dr. Scheiderer's conclusions do not comport with the DSM-5 criteria for
                 PTSD ..........................................................................................10

         b.      Dr. Scheiderer's Initial Report is atypical of what would be expected of a
                 forensic psychiatric report ...................................................................11

         c.      Dr. Scheiderer's Initial Report contains opinions outside the scope of his
                 alleged expertise and, further, contains overheated rhetoric more akin to the
                 language of an advocate, not an expert ...............................................13

V.      CONCLUSION...……………………………………………………..…………….15

i

## INDEX OF AUTHORITIES

### Cases

*Acosta v Vinoskey*
  310 F. Supp. 3d 662 (W.D. Va. 2018) ...............................................................................5

*Belville v Ford Motor Co.*
  919 F.3d 224, 232-33 (4th Cir. 2019)........................................................................4, 5, 6

*Bourne ex rel. Bourne v E.I. DuPont de Nemours & Co.*
  85 F. App'x 964, 966 (4th Cir. 2004) .............................................................................4

*Cady v Ride-Away Handicap Equip. Corp.*
  702 F. App'x 120, 124 - 25 (4th Cir. 2017) ...................................................................7

*Cavallo v Star Enter.*
  100 F.3d 1150, 1158 (4th Cir. 1996) ..............................................................................7

*Cooper v Smith & Nephew, Inc.*
  259 F.3d 194, 199 (4th Cir. 2001) ..................................................................................7

*Daubert v Merrell Dow Pharms., Inc.*
  509 U.S. 579, 589-890, 113 S.Ct. 2786 (1993) ...........................................4, 5, 6, 7, 8, 9

*Gen. Elec. Co. v Joiner*
  522 U.S. 136, 146, 118 S.Ct. 512 (1997) .......................................................................7

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*
  892 F.3d 624, 631 - 32 (4th Cir. 2018) ..........................................................................6

*Kumho Tire Co. v Carmichael*
  526 U.S. 137, 141, 119 S.Ct. 1167 (1999) .................................................................6, 7

*McEwen v Baltimore Washington Med. Ctr. Inc.*
  404 F. App'x 789, 791 - 92 (4th Cir. 2010) ....................................................................7

*Nease v Ford Motor Co.*
  848 F.3d 219, 228 (4th Cir. 2017)...............................................................................4, 6

*Oglesby v General Motors Corp.*
  190 F.3d 244, 250 (4th Cir. 1999) .............................................................................5, 6

*Pugh v Louisville Ladder, Inc.*
  361 F. App'x 448, 451 - 52 (4th Cir. 2010) ..............................................................4, 6, 9

*Radiance Found., Inc. v Nat'l Ass'n for the Advancement of Colored People*
  27 F. Supp. 3d 671, 674 (E.D. Va. 2013) ........................................................................5

*Small v WellDyne, Inc.*
  927 F.3d 169, 176 - 77 (4th Cir. 2019) ...........................................................................6

*Testerman v Riddell, Inc.*
    161 Fed. Appx. 286, 289 (4th Cir. 2006) ...................................................................5, 9

*Trigon Ins. Co. v United States*
    204 F.R.D. 277, 290 (E.D. Va. 2001) .........................................................................8, 14

*United States v Belyea*
    159 Fed. Appx. 525, 530 (4th Cir. 2005) .......................................................................7

*United States v Crisp*
    324 F.3d 261, 266 (4th Cir.2003) .............................................................................6, 9

*United States v Hassan*
    742 F.3d 104, 130 – 32 (4th Cir. 2014) .........................................................................7

*United States v Katsipis*
    598 Fed. Appx. 162, 164 (4th Cir. 2015) .......................................................................8

*United States v Muslim*
    *944 F.3d 154, 161-62 (4th Cir. 1998)*...........................................................................4

*United States v Wilson*
    484 F.3d 267, 274 - 75 (4th Cir. 2007) ..........................................................................5

*Westberry v Gislaved Gummi AB*
    *178 F.3d 257, 260-261 (4th Cir. 1999)*.................................................................4, 6, 7

*Wilhelm v Ameristep Corp.*
    No. 7:15-CV-00362, 2018 WL 6272911, at *4–5 (W.D. Va. Nov. 30, 2018) ...................5

## Statutes and Court Rules

Fed. R. Evid. 403 .............................................................................................................7, 8

Fed. R. Evid. 702 .................................................................................................4, 5, 6, 8, 14

## Treatises

4 Weinstein's Federal Evidence § 702.03 (2021) .........................................................8

## CONCISE STATEMENT OF ISSUES

(1)     Whether Dr. David Scheiderer should be excluded from offering testimony at trial due to his offering opinions outside of his area of expertise and the likelihood that his testimony would only confuse the trier of fact as to the issues germane to the matter?

        Nichols answer:          Yes.

        Plaintiffs will answer:  No.

(2)     Whether Dr. David Scheiderer should be excluded from offering testimony regarding PTSD when he did not follow the current DSM-5 criteria for PTSD and did not conduct his evaluation in accordance with recognized medical standards for a psychiatric evaluation.

        Nichols answer:          Yes.

        Plaintiffs will answer:  No.

## MOST APPROPRIATE CONTROLLING AUTHORITY

Fed. R. Evid. 403

Fed. R. Evid. 702

*Daubert v Merrell Dow Pharms., Inc.*
509 U.S. 579, 589-890, 113 S.Ct. 2786 (1993)

*Kumho Tire Co. v Carmichael*
526 U.S. 137, 141, 119 S.Ct. 1167 (1999)

*Belville v Ford Motor Co.*
919 F.3d 224, 232-33 (4th Cir. 2019)

## I.    INTRODUCTION

This lawsuit arises from a release of a formaldehyde solution following a truck accident when a tractor trailer driven by Defendant David Howard Bennet ("Bennett") containing a formaldehyde/methanol solution overturned (the "Release"), on the Virginia DOT right of way adjacent to the subject property located at 4152 Carr Rouse Road, Roanoke, Virginia 24014 (the "Property").  Plaintiffs Christopher, Susan, Robert and Sandra Sheldon[1] ("Plaintiffs") allege a myriad of claims arising out of the Release, along with a list of damages, including punitive damages in the amount of Six Million Dollars and XX/00 ($6,000,000.00), and a prayer for attorney's fees. *See* Complaint, at pgs. 21–23.  (ECF #1).

Plaintiffs have offered Dr. David J. Scheiderer as an expert in the field of psychology. For the reasons discussed with respect to his opinions, and in accordance with the controlling case law of the United States Supreme Court and the Fourth Circuit Court of Appeal, the opinions Dr. David J. Scheiderer offers are outside his stated areas of expertise, are offered without him following the recognized diagnostic criteria of the DSM-5, and/or are both prejudicial to Nichols and would be unhelpful, and in fact, confusing to the jury, and he should be excluded from testifying at trial.

## II.    STATEMENT OF UNDISPUTED FACTS

On the morning of June 11, 2014, Defendant Bennet, an employee of Nichols, was driving a tractor trailer towing a tanker filled with formaldehyde solution. (**Exhibit A, Roanoke County Police Incident Report**). Unbeknownst to Bennett's then employer, Defendant Nichols Transport Company, Inc. ("Nichols"), Mr. Bennett had deviated from the route assigned to him for this delivery. (**Exhibit B, Rough Deposition Transcript of Nichols 30(b)(6) Representative Dated July 21, 2021 at pg. 18, lines 1–8**). Mr. Bennett's deviation from his assigned route placed him on a stretch of Virginia Route 116, known locally as Jae Valley Road,

---

[1] With respect to Robert and Sandra Sheldon, reference is made to them both individually and as trustees of the Sheldon Family Revocable Trust.

which, according to local signage, is a road upon which tractor trailers of the type Bennett was driving at the time are prohibited. (**Exhibit A**). Mr. Bennett alleges that he did not see signage warning him of the prohibition of his entry upon Route 116 prior to turning onto the road and when he saw subsequent signs to that effect while on Route 116, Mr. Bennett was unable to turn his tractor-trailer around. (**Exhibit C, Transcript from Bennett's Criminal Proceeding Dated August 27, 2014 at pg. 7, lines 19–23**). Thereafter, Bennett proceeded slowly on Route 116, so slow that roughly two miles of traffic built up behind him. (**Exhibit A**). As motorists passed by Mr. Bennett on this narrow road, he was forced to apply his air brakes often to avoid collision. (**Exhibit C at pg. 9, lines 1–21**). By the time Mr. Bennett reached the "S" curve on the mountainside above the Property, the air brakes had been depleted. *Id.* Bennett was unable to negotiate the "S" curve and the tractor trailer went through a guardrail and overturned, which eventually resulted in the release of the contents of the tanker which he had been hauling. *Id.*

Neither Sheldon witnessed the accident occur.  **Exhibit D,** Panzer 12/14/20 Report re: Chris Sheldon, at pp. 1-2.  **Exhibit E,** Panzer 12/14/20 Report re: Susan Sheldon, at p. 2; Susan Sheldon out of curiosity went to the accident scene and went over a guardrail to get a closer look.  **Exhibit E,** Panzer 12/14/20 Report re: Susan Sheldon, at p. 2.

Police responding to the scene evacuated the local area, including the Plaintiffs, for several hours as first responders and environmental professionals mobilized to the scene to contain and remediate the Release. (**Exhibit A**). Over the next six years environmental professionals and contractors retained by Nichols, in conjunction with both state and federal environmental agencies, worked diligently to remediate the Release, and then monitor the groundwater at surrounding wells, ultimately resulting in a "No Further Action" determination by the State of Virginia Department of Environmental Quality ("VDEQ"). (**Exhibit F, No Further Action Letter**). The remediation and other work included, but was not limited to, air sparging to remove formaldehyde from the accident site, providing bottled water to Plaintiffs, installing a carbon treatment system on Plaintiffs' well, and making various other accommodations and

improvements to the Property, its buildings and its water systems, some of which were negotiated by Plaintiffs' counsel in a site access agreement with Nichols. (**Exhibit G, Site Access Agreement Dated July 19, 2014**). Additionally, Nichols compensated Plaintiffs for the cost of slaughtering their animals and for food and lodging for a short period of time while certain improvements and remediation activities were taking place at the Property. *Id.*

For several years Nichols arranged for water to be delivered to the Property for use by Plaintiffs and at one time had installed a carbon-based water filtration system on said Property. (**Exhibit H, Deposition of Christopher Sheldon Dated July 7, 2021 at pgs. 16-18, lines 15– 24, 1-25 and 1–4 respectively**). After the carbon treatment system was removed from Plaintiffs' water system, per demand made by Plaintiffs' counsel [s*ee* **Exhibit I, Demand to Remove Carbon System**], Plaintiffs subsequently complained of taste and odor issues with their water. Testing in or around November 2015 detected formaldehyde in Plaintiffs' well. (**Exhibit J, VDEQ Enforcement Recommendations and Plan Dated May 10, 2017**). Following the detection of formaldehyde in Plaintiffs' well, Nichols provided municipal water to Plaintiffs and neighboring residents until roughly November 2020 when it received approval of its "No Further Action" request from the VDEQ. (**Exhibit F**).

The VDEQ has approved closure and the Property is available for unrestricted residential use. (**Exhibit F**). As a result of Nichols' efforts, no physical injuries attributable to the Release were ever suffered by any of the Plaintiffs. (**Exhibit H at pg. 31, lines 10–15 and pg. 41, lines 8–13**). Plaintiffs filed suit on June 9, 2016 but did not inform Nichol's counsel of the suit, and almost one year later, on May 18, 2017, served Nichols with the suit. (**Exhibit K, Summons**). Plaintiffs are now claiming mental injuries, along with property related damages which they associate with the Release. *See generally* Pl. Compl.

## III.     APPLICABLE LAW

"[T]he Supreme Court's landmark precedent in *Daubert* . . . established that under the Federal Rules of Evidence the admissibility of scientific evidence no longer was limited to

knowledge or evidence generally accepted as reliable in the relevant scientific community."
*Belville v Ford Motor Co.*, 919 F.3d 224, 232-33 (4th Cir. 2019) (citing *Nease v Ford Motor Co.,*
848 F.3d 219, 228 (4th Cir. 2017) and *Daubert v Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-
890, 113 S.Ct. 2786 (1993)). (internal quotation marks omitted). "*Daubert* held that courts must
evaluate proposed expert testimony according to Rule 702, which tasks a district judge with
'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the
task at hand.'" *Id.* (quoting *Daubert*, 509 U.S. at 597). "This rule requires trial judges to conduct
a preliminary assessment of whether the reasoning or methodology underlying the testimony is
scientifically valid and of whether that reasoning or methodology properly can be applied to the
facts in issue. *Id.* (quoting *Daubert,* 509 U.S. at 592-93).

"The Supreme Court in *Daubert* required that the trial judge assess two factors to
determine whether to admit expert testimony: '(1) whether the testimony is based on scientific
knowledge (i.e. knowledge grounded in the methods and procedures of science), and (2)
whether the testimony will be helpful to the trier of fact.'" *United States v Muslim*, 944 F.3d 154,
161-62 (4th Cir. 1998) (citing *Daubert*, 509 U.S. at 590). The first prong of this inquiry
necessitates an examination of whether the reasoning or methodology underlying the expert's
proffered opinion is reliable-that is, whether it is supported by adequate validation to render it
trustworthy. *Bourne ex rel. Bourne v E.I. DuPont de Nemours & Co.*, 85 F. App'x 964, 966 (4th
Cir. 2004) (citing *Westberry v Gislaved Gummi AB,* 178 F.3d 257, 260-261 (4th Cir. 1999) and
*Daubert*, 509 U.S. at 590). "The focus of the first prong is therefore on the issue of reliability."
*Id.*, 85 F. App'x at 966. The second prong of the inquiry requires an analysis of whether the
opinion is relevant to the facts at issue. *Id.*, 85 F. App'x at 966 (citing *Westberry*, 178 F.3d at
261 and *Daubert*, 509 U.S. at 590).  The focus of the second prong is "fit." *See Bourne,* 85 F.
App'x at 966.

"Federal Rule of Evidence (FRE) 702 acts as the guidepost for the admissibility of expert
testimony." *Pugh v Louisville Ladder, Inc.*, 361 F. App'x 448, 451 - 52 (4th Cir. 2010) (citing

*United States v Wilson,* 484 F.3d 267, 274 - 75 (4th Cir. 2007)). "Under Rule 702, an expert's testimony is relevant if it has 'a valid scientific connection to the pertinent inquiry.'" *Belville,* 919 F.3d at 232 - 33 (citing *Daubert,* 509 U.S. at 592). "To be reliable, the testimony must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Id.* citing *Oglesby v General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) and *Daubert*, 509 U.S. at 590, 592 - 93. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Testerman v Riddell, Inc.*, 161 Fed. Appx. 286, 289 (4th Cir. 2006).

Relevant expertise is required, and "where experience is one of the bases for a witness's expertise, the witness must 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" *Wilhelm v Ameristep Corp.*, No. 7:15-CV-00362, 2018 WL 6272911, at *4–5 (W.D. Va. Nov. 30, 2018) (citing *Radiance Found., Inc. v Nat'l Ass'n for the Advancement of Colored People*, 27 F. Supp. 3d 671, 674 (E.D. Va. 2013)). With respect to relevance, the district court must ensure the proffered testimony will help "the trier of fact to understand the evidence or to determine a fact in issue." *Acosta v Vinoskey*, 310 F. Supp. 3d 662 (W.D. Va. 2018) (citing *Daubert*, 509 U.S. at 591).

The relevance and reliability of expert testimony is examined through consideration of, among other things: "(1) whether the particular scientific theory 'can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the

technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." *Pugh*, 361 F. App'x at 451 - 52 (quoting *United States v Crisp,* 324 F.3d 261, 266 (4th Cir.2003) and *Daubert,* 509 U.S. at 593–94) (internal quotations omitted).

No such list is exhaustive and "neither necessarily nor exclusively applies to all experts or in every case." *Belville*, 919 F.3d at 232 - 33 (citing *Kumho Tire Co. v Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167 (1999)). "[A]t bottom, the court's evaluation is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." *Id.* citing *Oglesby*, 190 F.3d at 250. "Thus, the trial court has 'broad latitude' in determining whether '*Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case.'" *Id.* citing *Kumho Tire*, 526 U.S. at 153.

"'[E]xpert witnesses have the potential to be 'both powerful and quite misleading.'" *Small v WellDyne, Inc.*, 927 F.3d 169, 176 - 77 (4th Cir. 2019) (quoting *Westberry*, 178 F.3d at 261). "Given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 - 32 (4th Cir. 2018). "[I]t is critical for district courts to diligently assess the admissibility of expert testimony. Under Rule 702, the trial judge has a special gatekeeping obligation[.]" *Small*, 927 F.3d at 176 - 77 (citing *Nease,* 848 F.3d at 230). "[O]n the most basic level, to be admissible, an expert testimony must be of 'scientific, technical or other specialized knowledge.'" *Id. citing* Fed. R. Evid. 702(a). "It must not be based on 'belief or speculation, and inferences must be derived using scientific or other valid methods.'" *Id. quoting Oglesby v General Motors Corp.*, 190 F.3d at 250.

"The district court's 'gatekeeping role' is to ensure that the 'testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Lipitor* at 631-32 (quoting *Daubert*, 509 U.S. at 597). "*Daubert* 's design is to 'make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* quoting *Kumho Tire Co.*, 526 U.S. at 152.

The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Cady v Ride-Away Handicap Equip. Corp.*, 702 F. App'x 120, 124 - 25 (4th Cir. 2017) (citing *Cooper v Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)). "[W]here the expert opinion 'has a greater potential to mislead than to enlighten,' that evidence 'should be excluded.'" *Id.* (citing *Westberry*, 178 F.3d at 261). Rule 702, "imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable." *Kumho Tire Co.,* 526 U.S. at 147 (internal quotation marks omitted). '"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *McEwen v Baltimore Washington Med. Ctr. Inc.*, 404 F. App'x 789, 791 - 92 (4th Cir. 2010) (quoting *Gen. Elec. Co. v Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512 (1997)).

Expert testimony also is subject to the restrictions of, and challenges pursuant to, FRE Rule 403 if its probative value is outweighed by the risk of unfair prejudice. *United States v Hassan*, 742 F.3d 104, 130 – 32 (4th Cir. 2014). The Supreme Court specifically noted in *Daubert* that in conducting an analysis regarding whether to permit a proffered expert to testify, a "district court should take into account any other applicable evidentiary rules, including Rule 403." *United States v Belyea*, 159 Fed. Appx. 525, 530 (4th Cir. 2005) (citing *Daubert*, 509 U.S. at 595). Even if an expert is deemed to have a scientifically valid basis for his or her opinion, the district court should still consider the prejudice provisions of Rule 403. *Cavallo v Star Enter.*, 100 F.3d 1150, 1158 (4th Cir. 1996). "Rule 403 permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...'" *Daubert,* 509 U.S at 595. "Trial courts need to be mindful, however, of the powerful and potentially misleading effect of expert testimony and to recognize

that unreliable or inapposite expert testimony is not helpful to the trier of fact, [e]xpert testimony

can also be excluded by applying Rule 403." 4 Weinstein's Federal Evidence § 702.03 (2021).

"[R]elevant evidence may be excluded if 'its probative value is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *United States v*

*Katsipis*, 598 Fed. Appx. 162, 164 (4th Cir. 2015) (quoting Fed. R. Evid. 403). The Fourth Circuit

has ratified the Supreme Court's caution with regard to expert opinions in *Daubert* and the need

for a careful FRE 403 prejudice analysis. *Id.* ("In regard to experts, the Supreme Court has

cautioned that '[e]xpert evidence can be both powerful and quite misleading because of the

difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against

probative force under Rule 403 of the present rules exercises more control over experts than

over lay witnesses." *Daubert,* 509 U.S. at 592-93.

The analysis of prejudice requires district courts "to remember that the pertinent rules of

evidence, the underlying philosophy behind allowing experts to testify, as well as the interests of

justice, mandate that a testifying expert give his own opinion, arrived at by a reliable mode of

analysis and that the opinion is not driven by a desire to reach a particular outcome, but by the

principled application of 'reliable principles and methods' to 'sufficient facts or data.'" *Trigon Ins.*

*Co. v United States*, 204 F.R.D. 277, 290 (E.D. Va. 2001) *quoting* Fed. R. Evid. 702. "[I]t is

specifically not an expert's position to advocate for a party, lest the witness ceases to be an expert

whose testimony is valuable because he or she is not an advocate and becomes, instead, just

another legal practitioner for the client."  Id.

**IV.**    **ANALYSIS**

Plaintiffs designated Dr. David J. Scheiderer ("Dr. Scheiderer") as an expert witness in

this case. (**Exhibit L, Plaintiffs' Expert Disclosures**). He is a licensed psychiatrist with a

practice emphasis on psychoneuroimmunology.  Dr. Scheiderer provided an expert report which

initially was undated; however, a date of November 12, 2020 was given in subsequent rebuttal

reports (the "Initial Report"). (**Exhibit M, Undated Scheiderer Report**).  Dr. Scheiderer also

provided rebuttal reports, one for Plaintiff Susan Sheldon and one for Plaintiff Christopher Sheldon, dated January 6, 2021 (the "Rebuttal Reports"). (**Exhibit N, Rebuttal Report Dated January 6, 2021 for Susan Sheldon; Exhibit O, Rebuttal Report Dated January 6, 2021 for Christopher Sheldon**) and he was deposed on July 30, 2021. (**Exhibit P, Rough Deposition Transcript of Dr. Scheiderer Dated July 20, 2021**).

As discussed *infra*, and in accordance with the controlling Supreme Court and Fourth Circuit laid out *supra*, Dr. Scheiderer should be excluded from providing expert testimony at trial. Peculiarly, he purports to have prepared an "expert" report based off a 15-minute evaluation during which he did not take any notes or make any writings.  Rough Transcript, at pp 25:7-24, 51:24- 52:10.   Certain of his opinions are without any basis in his claimed areas of expertise. He should not be given the opportunity to testify as to those opinions, as they neither pass muster with respect to the three factors to be considered as explained in *Testerman v Riddell, Inc.*, 161 Fed. Appx. 286, 289 (4th Cir. 2006) ("(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case") nor the five factors to be weighed regarding the relevance and reliability of expert testimony ("(1) whether the particular scientific theory 'can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." *Pugh*, 361 F. App'x at 451 - 52 (quoting *United States v Crisp,* 324 F.3d 261, 266 (4th Cir.2003) and *Daubert,* 509 U.S. at 593 – 94) (internal quotations omitted).

Moreover, Dr. Scheiderer's opinions are rife with hyperbole and made without underlying support. In several instances during his deposition, Dr. Scheiderer was forced to admit that he had no bases for some of his claims, especially those with respect to formaldehyde exposure. For example, on direct examination, Dr. Scheiderer admits he is not an expert in formaldehyde

exposure (**Exhibit P at pg. 79, lines 17–18**), admits that it was "common sense" and not any objective analytical data, reports or otherwise that led him to believe that the Sheldons had been exposed to formaldehyde (*Id.* at pg. 81, lines 4–16) and opines, "is there some interplay there? I don't know." *Id.* at pg. 79, lines 19–20. While these flaws and lack of foundation to his opinions is laid bare by his deposition testimony, it can be anticipated that Dr. Scheiderer will nonetheless espouse these unsupported, unsubstantiated opinions again at trial. Science and chemical exposure risk are most appropriately left to those who practice in those areas. Such unsupported opinions, if presented to the jury, will cause undue prejudice to Nichols, and not assist, but rather confuse the jury in its role as factfinder.

    **a.**    **Dr. Scheiderer's conclusions do not comport with the DSM-5 criteria for PTSD.**

In the Rebuttal Reports, when Dr. Scheiderer finally got around to addressing the DSM-5 criteria for PTSD, he lists the DSM-5 requirements for "criteria A" as follows: "the DSM-5 provides that this criterion is met by any one (or more) of four ways:

- o   Directly experiencing the traumatic event(s).

- o   Witnessing, in person, the event(s) as it occurred to others.

- o   Learning that the traumatic event(s) occurred to a close family member [if violent or accidental].

- o   Experiencing repeated or extreme exposure to aversive details of the traumatic event(s)." (**Exhibit O at pg. 2**).

During his deposition, Dr. Scheiderer is asked whether Chris or Susan Sheldon experienced an event which qualifies under criteria A, to which he responded, "[i]t's well defined in the DSM-5, and that is there has to be that trauma. And there was the trauma, the truck going down the wrong road and spilling all that formaldehyde[2]. That was the – that was the trauma. That was the cause." (**Exhibit P at pg. 104, lines 20–25**). He later states that the qualifying

---

[2] An event that neither Sheldon witnessed first-hand.

trauma was "the whole thing…the way it unfolded." *Id.* at 141, lines 14–16. And continues, "[s]o I can't pinpoint any one of those things. It's that whole episode, and then what ensued afterwards to aggravate it, exacerbate it, perpetuate it, make him relive it." *Id.* at pg. 143, lines 21–25.

Again, the DSM-5 requires the patient to have *directly experienced* a traumatic event or learned that such a traumatic event had happened to a loved one. **(Exhibit O at pg. 2)**. Nowhere in the DSM-5 does it allow a practitioner to proceed past criteria A on the basis of a "whole episode," that the practitioner "can't pinpoint." Id. at pg. 143, lines 21–25.  Having failed to faithfully apply basic psychiatric principles and methods reliably to the facts of the case, Dr. Scheiderer should be excluded from testifying.

**b.** **Dr. Scheiderer's Initial Report is atypical of what would be expected of a forensic psychiatric report.**

By far the biggest, most glaring oversight in the Initial Report is the failure of Dr. Scheiderer to make any reference to the Diagnostic and Statistics Manual, also known as the "DSM-5." In his Rebuttal Reports, Dr. Scheiderer states that his "opinions with regard to Mr. Sheldon are based on traditional psychiatric assessment, including the DSM-5…" (**Exhibit O at pg. 7**). Dr. Scheiderer even states in the Rebuttal Report relevant to Susan Sheldon that, "[c]linical evaluation based on and applying the DSM-5 remains the most relied upon authority for diagnostic criteria of PTSD." (**Exhibit N at pg. 2**). Despite the acknowledged importance of the DSM-5 to PTSD diagnoses, Dr. Scheiderer did not feel it necessary to include a discussion of the DSM-5 criteria in his Initial Report or even a discussion of the symptoms seen in the Sheldon's which form the bases of his PTSD diagnosis. Like several other items missing from the Initial Report (e.g. separate reporting of the interviews he said he conducted, a date the report was written, documentation of medical record content) once he was called to task for these failures in his Initial Report by Dr. Panzer, his Rebuttal Reports contained these items, including an analysis of the DSM-5. Those are not properly items of rebuttal but are omissions which render the initial opinions unreliable.

The Initial Report notably purports to be a psychological analysis of two people, Christopher and Susan Sheldon, but at the same time, fails to address each of them separately. *See generally,* **Exhibit M**. Nowhere in the report is there an attribution to either of the Sheldon in connection with any alleged fact provided or alluded to. *Id.* Instead, the parties are considered jointly, and not surprisingly are assigned the same "diagnosis". *Id.* The Initial Report fails to document a mental status examination, a history of present illness, or even a "SOAP" note[3] as Dr. Scheiderer testified would be done. *Id.* Further, the Initial Report does not make any notation as to what is contained in either Sheldon's past medical records, except to list the names of providers. *Id.*

Despite the absence of these features in the Initial Report, Dr. Scheiderer testified at deposition that "I write a progress note every time I see a patient, whether its virtual or face-to-face, where I'll do the standard documentation. I do a SOAP note, kind of, what is it, presenting kind of chief complaint. (**Exhibit P at pg. 28, lines 12–15**). Dr. Scheiderer continues, "the objective would be my mental status examination. How they appear to me, either on the phone or through the camera or in the office. And – and then at the end of that I'll make an assessment, particularly as to – with respect to whether they're imminently dangerous to themselves or others." *Id.* at pgs. 28-29, 24–29:5. Despite these declarations, he did not prepare any written notes commensurate with the evaluation and none of these things appear in the Initial Report. (**Exhibit M**).

Dr. Scheiderer also stated at deposition that if he considered alternate explanations as to the source of either Sheldon's PTSD diagnoses, he would have documented this in the record. (**Exhibit P at pg. 87, lines 18–23**). In light of this pronouncement, the reader of the Initial Report should assume that Dr. Scheiderer did not consider any of the following pre-

---

[3] "SOAP" notes are an evaluation of Subjective, Objective, Assessment and Plan documentation. *See, e.g.,* "What Are SOAP Notes in Counseling? (incl. Examples)" *available at* https://positivepsychology.com/soap-notes-counseling/

existing issues, pre-existing issues which are prevalent in the Sheldon's medical records and which the Sheldons recounted to Dr. Panzer: pre-existing marital issues, pre-existing issues either Sheldon had with their parents, pre-existing psychological issues, mold exposure at another home, financial issues, Christopher Sheldon's daughter's substance abuse issues, the Sheldon's daughter Penelope's seizures and inability to walk, Christopher's pre-existing drug and alcohol use and the Sheldon's pre-existing medical issues. *Id.* at pgs. 87–107.

  c. **Dr. Scheiderer's Initial Report contains opinions outside the scope of his alleged expertise and further contains overheated rhetoric more akin to the language of an advocate, not an expert.**

   In his Initial Report, Dr. Scheiderer notes that he "emphasizes psychoneuroimmunology ("PNI")," and even pens a section in that report which purports to apply this discipline to his analysis of Plaintiffs. (**Exhibit M at pp 1 and 5**). PNI is not a subspeciality of psychiatry nor is it within the scope of traditional psychiatric practice. (**Exhibit E, Rebuttal Report of Dr. Dale Panzer related to Susan Sheldon, Dated December 14, 2020 at pg. 17**). At his deposition, Dr. Scheiderer admits that there is no board certification of any type for PNI. (**Exhibit P at pg. 39, lines 11–13**). During his deposition, Dr. Scheiderer notes that to confirm PNI related conclusions, he often performs laboratory studies, which include blood work, urinalysis or saliva analysis. *Id.* at 38,  line 23- p. 39, line 1. Despite these ostensibly confirmatory studies, Dr. Scheiderer admits that he performed no such studies of either Christopher or Susan Sheldon. *Id.* at 68, line 9- p. 72, lines 2). He then contradicted his original statement regarding confirmatory studies, saying that there are "no biomarkers in psychiatry. So all of those labs you asked me about, neuroimaging studies you asked me about would not necessarily give me much information." *Id.* at pg. 75, lines 10– 3. If told to the jury, which would he expect them to believe: that PNI is a legitimate tool a psychologist can wield with confirmatory objective testing; or that said confirmatory objective testing is irrelevant to the practice of psychiatry? Both cannot be true, and such would certainly serve to confuse the trier of fact.

The Initial Report also contains reference to alleged medical effects of formaldehyde exposure, despite Dr. Scheiderer's later admission that he has no basis to have held such beliefs. On page one of the Initial Report, he notes that formaldehyde is a "neurotoxic and carcinogenic chemical." (**Exhibit M**). Later in the report, Dr. Scheiderer states, "formaldehyde is a known carcinogen, and exposure can result in neurological effects including on learning, memory and behavior. The exposure to formaldehyde which occurred under these remarkable circumstances yields an additive neurotoxic and contributing effect to Mr. and Mrs. Sheldon's respective traumatic experience, physical and emotional injuries and symptoms." *Id.* at pg. 4. The report even describes the formaldehyde spill as flowing, "down directly into the Sheldon's property." *Id.* at 3. Despite these claims, at deposition Dr. Scheiderer admits that, "I'm again not going to render an opinion on formaldehyde." (**Exhibit P at pg. 84, line 25 – p. 85, line 1**). Dr. Scheiderer further admitted that he has seen no evidence that Susan or Christopher Sheldon were exposed to formaldehyde. *Id.* at pg. 85, lines 1–8, and 10–25.

Dr. Scheiderer's Initial Report is also littered with overheated rhetoric which can only serve to showcase his advocacy for Plaintiffs' lawsuit, rather than bolster his credibility as "a testifying expert giv[ing] his own opinion, arrived at by a reliable mode of analysis . . . by the principled application of 'reliable principles and methods' to 'sufficient facts or data.'" *Trigon Ins. Co.,* 204 at 290 *quoting* Fed. R. Evid. 702. The Initial Report describes a "sudden and global trauma which affected [Plaintiffs'] whole lives, their children, animals, crops, soil and water sources, with acute and long term effects," as well as "massive trauma." (**Exhibit M at pg. 2**). The report references the, "back breaking long process of creating and working the farm." *Id.* at 3. Dr. Scheiderer describes a trauma that, "suddenly, dramatically, and from their perspective, wholly unpredictably began the process that would end all to which they had directed their lives and that of their family." *Id.* at pg. 4. And he continues, "[t]he scale of this sudden loss of all they had long focused on, individually, together, and as a family, is total. The ongoing grief, anger,

and other discussed symptomatology underlying this post-traumatic stress is permanent and is proximately caused by this trauma." *Id.*

The hype continues in the report with a description of Mr. Sheldon's alleged, "symptoms of overwhelming fatigue, lack of energy, lack of joy…" *Id.* at pg. 5. As will be discussed *infra*, the reader is left without any indication in this report as to whether the described hyperbole are direct quotations of the Sheldons or rhetorical flair of the Dr. Scheiderer, acting improperly an advocate as opposed to an expert, as Dr. Scheiderer makes no indication in the Initial Report of who told him what (either Chris, Susan, or anyone for that matter), in what context it was said and in exactly the form it was said. This is largely due to Dr. Scheiderer's jaw dropping deposition admissions:

1) that ***he took absolutely no notes, or made any other type of recording during his alleged interviews with Plaintiffs***;

2) that his file consists of solely his three written reports alone; and

3) not even invoices are contained within his file, as he is not sure whether he has billed anything for his work on this matter (**Exhibit P at pg. 7, lines 15–18, and pg. 64, lines 17–24**).

### V.    <u>CONCLUSION</u>

Based upon the above, Defendant Nichols Transport Company, Inc. requests this Honorable Court grant its Motion to Exclude Dr. David Scheiderer's reports and testimony in this matter and enter an Order reflecting same.

Respectfully submitted,

LAW OFFICE OF COOLEY AND ASSOCIATES, PLC

Dated:  August 16, 2021

By:_____/s/John L. Cooley_____
     John L. Cooley (VSB #25962)
Law Office Cooley and Associates PLC
40 British Woods Drive, Suite 101
P.O. Box 19687
Roanoke, VA  24019
Telephone:  (540) 339-3300
Facsimile:   (540) 323-1745
Email: jlcooley@cooleyfirm.com
*Co-Counsel for Defendant Nichols Transport Inc*

FOLEY, BARON, METZGER & JUIP, PLLC

By:_____/s/Richard S. Baron_____
     Richard S. Baron (P33798 - MI)
     Nicholas J. Tatro (P79146 - MI)
Foley, Baron, Metzger & Juip, PLLC
38777 Six Mile Road, Suite 300
Livonia, MI  48152
Telephone: (734) 742-1855
Facsimile: (734) 521-2379
Email: rbaron@fbmjlaw.com; ntatro@fbmjlaw.com
Admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2021, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system which will send notification of such filing to all parties of

record.

_____/s/Richard S. Baron_____
        Richard S. Baron

16